Jamie **DEMERY; Samantha Moore; Aracelia Leticia Pfeifer; Janet Lee King; Jerri Cabaniss; Rosa Velazquez; Cynthia Matthers; Rhonda Farmer; Sandra Puebla; Jordan Martin; Laura Hartney; Elena M. Irvine; Yvette Rose Leon; Tina Marie Sox; Loretta Christie; Alison Lee Adair; Victoria Zepeda; Nikisha Calliste; Terry McEvoy; Tom Odenkirk; Dean Tousignant; Benny David Berryman; Damon Scoggin; Sean Botkin, Plaintiffs–Appellees,**

v.

Joe **ARPAIO, Maricopa County Sheriff, in his official capacity, Defendant–Appellant,**

and

**County of Maricopa; John/Jane Does 1–100, Defendants.**

No. 03–15698.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 3, 2003.

Filed Aug. 6, 2004.

Daniel P. Struck, Phoenix, AZ, for the defendant-appellant.

Scott A. Ambrose, Phoenix, AZ, Ulises A. Ferragut, Jr., Ferragut & Associates, Phoenix, AZ, for the plaintiffs-appellees.

Before PAEZ, BERZON, and BEA, Circuit Judges.

PAEZ, Circuit Judge.

The Fourteenth Amendment prohibits punishment of pretrial detainees. *Bell v. Wolfish*, 441 U.S. 520, 535, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Applying this principle, the district court preliminarily enjoined the use of world-wide web cameras ("webcams") in the Maricopa County Madison Street Jail. We must decide whether the district court abused its discretion in granting the plaintiffs' motion for a preliminary injunction. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## I.

When Maricopa County Sheriff Joe Arpaio announced the installation of webcams in the Madison Street Jail, he proclaimed "[w]e get people booked in for murder all the way down to prostitution.... When those johns are arrested, they can wave to their wives on the camera." Sheriff Arpaio also explained that his policy deterred crime and opened up the jails to public scrutiny: "The public has the right to know what's going on in our jails.... And I believe that they act as a tool to deter crime. We hope that the *only* visit people make to our jail is a virtual visit." In July 2000, four webcams began streaming live images of pretrial detainees to internet users around the world.

Sheriff Arpaio installed the webcams at the County's Madison Street Jail, a facility used exclusively to house pretrial detainees. The four webcams were placed within areas of the jail that were not open to the public except through prearranged tours. They were installed in close proximity to closed-circuit security cameras that were monitored twenty-four hours a day by Sheriff's officers.

One camera was trained on the men's holding cell. Web users could view only a portion of this holding cell, including the bunk bed area. Those detained in the men's holding cell could therefore avoid being seen by moving to an area of the cell that was outside of the camera's view.

A second camera captured images of the pre-intake area. Pretrial detainees could be viewed being photographed, fingerprinted, and booked. A third camera was focused on the intake search area. This webcam captured live images of pretrial detainees being subjected to patdown searches.

The location of the final camera is hotly contested by the parties. The plaintiffs contend that for at least six months, one webcam captured images of the toilet and surrounding area in the women's holding cell. They also argue that the camera was only repositioned in response to this lawsuit, and that in the absence of an injunction, the Sheriff could simply move the camera back to its original location. Sheriff Arpaio, however, contends that his officers moved the camera within hours of learning that the images of the toilet area were being displayed over the internet. In any event, the camera was ultimately repositioned to capture images of the hallway outside of the holding cells.

In order to transport the images from the Madison Street Jail to web users' computers, the images had to be streamed to a website. Although the Maricopa County Sheriff's website [1] initially hosted the webcam images, the number of visitors to the site quickly overwhelmed that website's capacity. As a result, Sheriff Arpaio entered into an arrangement with a website called "Crime.com" to distribute the images to the public.

Finally, in order to view the webcam images, web users had to direct their web browsers to the Crime.com website and click on a series of links. The website informed visitors that "[i]f you find yourself sitting on this bunk, you probably have been arrested for drunk and disorderly behavior, drug possession, spousal abuse, or prostitution. Most people inside the Madison Street Jail are facing misdemeanor charges but Deputies see their fair share of murderers as well." Visitors to the Crime.com's *Jail Cam Special Ops* webpage found the following four links:

1. *"crime.com's Virtual Tour:* You are busted! Enter the Madison Street Jail

---

1. The uniform resource locator for the Sheriff's website is http://www.mcso.org.

as a detainee and see what it's like to be booked, searched, and locked-up."

2. *"Meet Sheriff Joe:* It's his jail and he's proud of it. Spend a day in the life of Sheriff Joe Arpaio on his own turf, where inmates wear pink underwear, eat green bologna and work on chain gangs."

3. *"Jail Cam:* See the first live camera in a working jail. Watch what's happening at Madison Street Jail NOW."

4. *"Shakedown:* See the first shakedown in four years at the Madison Street Jail. Watch as SWAT teams raid male and female inmate holding cells in search of smuggled drugs and crude weapons."

Visitors that chose the "Jail Cam" link were then directed to a web page where they could choose which of the four webcams they wanted to view.

Within the first few days of operation, the Crime.com website recorded six million hits, with web users visiting from as far away as Sweden, Britain, and Germany. As was the case with the Maricopa County Sheriff's website, however, the Crime.com website was unable to accommodate the number of visitors interested in viewing the webcam images. But for reasons that are unclear from the record, the Crime.com website ceased operations after this suit was filed but before the district court granted the preliminary injunction.

This suit was brought by twenty-four former Madison Street Jail detainees who challenged the Sheriff's webcam policy in Arizona state court. The defendants, Sheriff Arpaio and the County of Maricopa, removed the case to the United States District Court for the District of Arizona. After determining that there was still a live controversy, because Sheriff Arpaio was seeking a new host for the webcam images, the district court preliminarily enjoined the Sheriff from operating the web-

cams because the Sheriff's policy unconstitutionally punished pretrial detainees in violation of the Fourteenth Amendment.

Sheriff Arpaio filed this timely appeal. Although he concedes that there is a live controversy, he argues that the district court abused its discretion in granting preliminary injunctive relief.

## II.

■ We first consider whether this case is moot. "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack,* 395 U.S. 486, 496, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). Neither party contends on appeal that this case is moot, a factor that weighs in favor of our jurisdiction because a "party moving for dismissal on mootness grounds bears a heavy burden." *Coral Constr. Co. v. King County,* 941 F.2d 910, 927–28 (9th Cir.1991). Nonetheless, we have an independent duty to consider *sua sponte* whether a case is moot, *Dittman v. California,* 191 F.3d 1020, 1025 (9th Cir. 1999), and we consider this issue *de novo. Wade v. Kirkland,* 118 F.3d 667, 669 (9th Cir.1997).

■ There are two significant events that might render this dispute moot—the termination of the Crime.com website and the release of the plaintiffs from the Madison Street Jail. We conclude, however, that this controversy is not moot and therefore we have jurisdiction to address the merits of Sheriff Arpaio's appeal.

■ First, we agree with the parties that the termination of the Crime.com website does not render this case moot. Sheriff Arpaio intends to and likely will find another web host willing to display the live images of the Madison Street Jail. Although a suit for injunctive relief is nor-

mally moot upon the termination of the conduct at issue, such a claim is not moot if there is a likelihood of recurrence. *See Fed. Trade Comm'n v. Affordable Media, LLC*, 179 F.3d 1228, 1238 (9th Cir.1999) (holding that injunctive relief does not become moot by defendants' voluntary cessation of allegedly wrongful behavior unless it is "absolutely clear that the allegedly wrongful behavior cannot reasonably be expected to recur") (quoting *Norman–Bloodsaw v. Lawrence Berkeley Laboratory*, 135 F.3d 1260, 1274 (9th Cir.1998)); *Norman–Bloodsaw*, 135 F.3d at 1274 (holding that defendants in suit for injunctive and declaratory relief must establish "*either* that their alleged behavior cannot be reasonably expected to recur, *or* that interim events have eradicated the effects of the alleged violation").

■ True, in this case the immediate cause of the defendant's cessation of the disputed activity was not in the short term voluntary, as it was not Sheriff Arpaio who discontinued the Crime.com website. *Compare, e.g., Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 222, 120 S.Ct. 722, 145 L.Ed.2d 650 (2000) (describing how the Federal Government voluntarily ceased its offending conduct and holding that the case was not moot); *Norman–Bloodsaw*, 135 F.3d at 1274 (holding that the voluntary cessation by United States Department of Energy of mandatory testing for syphilis and other private, medical conditions did not moot the plaintiffs' claims). Nonetheless, as the voluntary cessation and capable-of-repetition-yet-evading-review cases, discussed *infra*, both illustrate, a more general principle underlies the mootness determination. Once a defendant has engaged in conduct the plaintiff contends is unlawful and the courts have devoted resources to determining the dispute, there is Article III jurisdiction to decide the case as long as "the parties [do

not] plainly lack a continuing interest...." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 192, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000).

In light of Sheriff Arpaio's unequivocal representations, it is likely that the Sheriff will reactivate the webcams if the injunction is vacated. The Sheriff was actively searching for a new website host before the district court issued the preliminary injunction, and has stated that he plans to continue his search if the preliminary injunction is reversed. Because the Madison Street Jail images increased the popularity of the crime.com website, and because web technology advances rather than retreats, there is no basis for supposing that the Sheriff will not succeed in his search for a new host. It is also possible that the Sheriff could upgrade his own website to show the images. As the defendant intends to resume his behavior if he can and there has been no showing that recurrence is not technologically and otherwise feasible, it is reasonably likely that he will resume the contested web postings. As there is a sufficient likelihood that the Sheriff's use of webcams will recur, the temporary cessation caused by the demise of Crime.com does not render this case moot.

■ Second, the release of the plaintiffs from the Madison Street Jail and consequent inability to post their images on the web any longer does not render this case moot, because this controversy falls squarely within the capable-of-repetition-yet-evading-review branch of the mootness doctrine. This branch applies when (1) the duration of the challenged action is too short to be litigated prior to cessation, and (2) there is a "reasonable expectation" that the same parties will be subjected to the same offending conduct. *Spencer v. Kemna*, 523 U.S. 1, 17–18, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998); *Mitchell v. Dupnik*, 75

F.3d 517, 528 (9th Cir.1996). Because the Madison Street Jail is a pretrial detention center, "the length of detention in the county jail is short enough that any individual detainee's claim would probably become moot before trial." *Oregon Advocacy Ctr. v. Mink,* 322 F.3d 1101, 1117–18 (9th Cir.2003). As the Supreme Court has explained, "[p]retrial detention is by nature temporary, and it is most unlikely that any given individual could have his constitutional claim decided on appeal before he is either released or convicted." *Gerstein v. Pugh,* 420 U.S. 103, 111 n. 11, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). In these circumstances, the plaintiffs readily satisfy the first prong of the capable-of-repetition-yet-evading-review branch of the mootness doctrine.

To satisfy the second prong, the plaintiffs "must show either a 'demonstrated probability' or a 'reasonable expectation' that [they] would be transferred back to[the Madison Street Jail] or released and reincarcerated there." *Oliver v. Scott,* 276 F.3d 736, 741 (5th Cir.2002) (quoting *Murphy v. Hunt,* 455 U.S. 478, 482, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982)); *see also Mitchell,* 75 F.3d at 528. Our analysis of this second prong is guided by our decision in *Mitchell.* In *Mitchell,* the district court enjoined the challenged pretrial detention center policy even though the plaintiff had been convicted and transferred to state prison. Because the plaintiff was pursuing post-conviction relief that, if he were successful, would entitle him to a new trial, the district court held that the plaintiff had a reasonable expectation that he would return to the pretrial detention center. We reversed, noting that although these "circumstances arguably satisfied the exception's second prong," the plaintiff no longer had a reasonable expectation that he would be reincarcerated at the pretrial detention facility because the plaintiff's petitions for post-conviction relief had since been denied. 75 F.3d at 528.

In contrast, the record here contains compelling evidence that the plaintiffs likely will be reincarcerated at the Madison Street Jail. For example, plaintiff Benny Berryman was detained at the Madison Street Jail on twenty different occasions between February 1997 and June 2002. Eleven other named plaintiffs also have been detained at the Madison Street Jail on more than one occasion. Thus, this controversy also satisfies the capable-of-repetition prong. Accordingly, the case is not moot and we have jurisdiction to decide the merits of Sheriff Arpaio's challenge to the district court's preliminary injunction order.

### III.

In considering Sheriff Arpaio's arguments, we begin with the proposition that our review of a district court order granting a preliminary injunction is "subject to limited review." *United States v. Peninsula Communications, Inc.,* 287 F.3d 832, 839 (9th Cir.2002). We can reverse the district court only if it abused its discretion. *Gorbach v. Reno,* 219 F.3d 1087, 1091 (9th Cir.2000) (en banc). The district court necessarily abuses its discretion if it relies on an erroneous legal standard or on clearly erroneous factual findings. *Brookfield Communications, Inc. v. West Coast Entm't Corp.,* 174 F.3d 1036, 1046 (9th Cir.1999). Accordingly, we review *de novo* any underlying issues of law. *Does 1–5 v. Chandler,* 83 F.3d 1150, 1152 (9th Cir.1996). However, "[w]e typically will not reach the merits of a case when reviewing a preliminary injunction. By this we mean we will not second guess whether the court correctly *applied* the law to the facts of the case, which may be largely undeveloped at the early stages of litigation." *Rucker v. Davis,* 237 F.3d

1113, 1118 (9th Cir.2001) (en banc) (internal citations omitted), *rev'd on other grounds by Dept. of Hous. and Urban Dev. v. Rucker,* 535 U.S. 125, 122 S.Ct. 1230, 152 L.Ed.2d 258 (2002).

Sheriff Arpaio's challenges to the district court's order boil down to two arguments: the district court misidentified the applicable law and the district court misapplied the law to the facts of this case. We consider these contentions separately.

## A.

 In evaluating the plaintiffs' motion for injunctive relief, the district court applied the correct legal standard. As the district court recognized, the Supreme Court held in *Bell v. Wolfish* that "under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." 441 U.S. at 535, 99 S.Ct. 1861. More specifically, the district court correctly identified and applied *Bell's* test for identifying unconstitutional punishment at the pretrial stage of a criminal proceeding. That test asks whether there was an express intent to punish, or "whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]." *Id.* at 538, 99 S.Ct. 1861 (quoting *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 168–69, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963)). Sheriff Arpaio contends that this was an incorrect legal standard because the plaintiffs never raised a *Bell* challenge to the webcams. The plaintiffs' district court filings reveal otherwise.

For example, the plaintiffs' fifth and eighth causes of action, as well as their motion for a preliminary injunction, alleged that the webcams violated their Fourteenth Amendment Substantive Due Process rights. In footnote 4 of their complaint, the plaintiffs specifically claimed that the webcams undermined their Fourteenth Amendment Substantive Due Process right to be free of punishment. And in their response to the defendants' motion to dismiss, which was heard in conjunction with the plaintiffs' motion for a preliminary injunction, the plaintiffs argued that "the Internet displays are punishment, the very thing that the state and federal constitutions prohibit governments from imposing upon unconvicted prisoners."

 Alternatively, Sheriff Arpaio argues that the four-part "reasonable relation" test of *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987),[2] replaced the *Bell* punishment test. He concedes, however, that we have continued to apply *Bell* even after the Supreme Court's decision in *Turner. See Valdez v. Rosenbaum,* 302 F.3d 1039, 1045–47 (9th Cir. 2002), *cert. denied,* 538 U.S. 1047, 123 S.Ct. 2110, 155 L.Ed.2d 1087 (2003). We are, of course, powerless to overrule the decision of a prior Ninth Circuit panel. *See Bonin v. Vasquez,* 999 F.2d 425, 428 (9th Cir. 1993). Moreover, *Turner* is inapposite for two reasons. First, *Turner* dealt with convicted prisoners, not pretrial detainees. Second, *Turner* involved an Eighth Amendment cruel and unusual punishment challenge, not a claim brought under the Substantive Due Process Clause of the

**2.** *Turner's* four-factor test for determining whether a prison regulation is reasonable asks: (1) whether the objective is "legitimate and neutral" and logically connected to the challenged regulation; (2) whether the prisoners have alternative means of exercising the right that they allege is infringed; (3) whether

accommodation would have a "significant ripple effect" on guards, prisoners, and prison resources; and (4) whether there are a lack of alternative prison policies that could satisfy the objective. 482 U.S. at 89–91, 107 S.Ct. 2254.

Fourteenth Amendment.[3] Both distinctions are critical because the Fourteenth Amendment prohibits all punishment of pretrial detainees, while the Eighth Amendment only prevents the imposition of cruel and unusual punishment on convicted prisoners. *See Bell*, 441 U.S. at 535 n. 16, 99 S.Ct. 1861.

■ Finally, Sheriff Arpaio suggests that the district court strictly scrutinized the webcam policy, even though *Bell* only permits courts to examine whether the policy is an excessive response to a legitimate purpose. The district court determined that improving jail security was not a legitimate alternative purpose for the webcams because they were placed nearby closed-circuit security cameras. Thus, it concluded that the webcams "amount to an exaggerated response to an already-fulfilled security need." Sheriff Arpaio asserts that this amounts to strict scrutiny, but we disagree. In *Bell*, the Court held that the means employed cannot be "excessive in relation to the alternative purpose." 441 U.S. at 538, 99 S.Ct. 1861. Although the district court used the term "exaggerated" rather than "excessive," this hardly proves that it was employing strict scrutiny. And in light of the fact that closed-circuit security cameras already were stationed nearby and the webcam images could be viewed by millions of people worldwide, the webcams were plainly an excessive response to Sheriff Arpaio's interest in maintaining jail security. In sum, the Sheriff has failed to demonstrate that the district court applied an erroneous legal standard.

## B.

■ Sheriff Arpaio also challenges the district court's application of *Bell* to the facts of this case. This line of argument, however, ignores our standard of review for a preliminary injunction. As we have explained before, "[a]s long as the district court got the law right, it will not be reversed simply because the appellate court would have arrived at a different result if it had applied the law to the facts of the case." *A & M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir.2001) (quoting *Gregorio T. v. Wilson*, 59 F.3d 1002, 1004 (9th Cir.1995)) (internal quotation marks omitted).

■ Additionally, we agree with the district court's application of the law to the facts. As we noted earlier, *Bell* held that, "under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." 441 U.S. at 535, 99 S.Ct. 1861. For a particular governmental action to constitute punishment, (1) that action must cause the detainee to suffer some harm or "disability," and (2) the purpose of the governmental action must be to punish the detainee. *Bell*, 441 U.S. at 538, 99 S.Ct. 1861("A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose."). Both requirements are met here.

Plaintiffs were certainly harmed by Sheriff Arpaio's actions. Having every moment of one's daily activities exposed to general and world-wide scrutiny would make anyone uncomfortable. Exposure to millions of complete strangers, not to mention friends, loved ones, co-workers and employers, as one is booked, fingerprinted, and generally processed as an arrestee, and as one sits, stands, or lies in a holding

---

**3.** We note that even under the *Turner* test, the Supreme Court struck down an almost complete ban on prisoner marriages because it was "an exaggerated response" to the objectives put forth by prison administrators. 482 U.S. at 97–98, 107 S.Ct. 2254.

cell, constitutes a level of humiliation that almost anyone would regard as profoundly undesirable and strive to avoid.

■ Nothing in *Bell* requires that, to be punishment, a harm must be independently cognizable as a separate constitutional violation (e.g., a deprivation of First Amendment rights, or a violation of a constitutional right to privacy). Rather, to constitute punishment, the harm or disability caused by the government's action must either significantly exceed, or be independent of, the inherent discomforts of confinement. *Bell*, 441 U.S. at 537, 99 S.Ct. 1861("Loss of freedom of choice and privacy are inherent incidents of confinement in such a facility. And the fact that such detention interferes with the detainee's understandable desire to live as comfortably as possible and with as little restraint as possible during confinement does not convert the conditions or restrictions of detention into 'punishment.' ").

In *Bell*, the Supreme Court determined that the practice of double-bunking pretrial detainees did not impose enough of a hardship to rise to the level of a constitutional violation. 441 U.S. at 543, 99 S.Ct. 1861. In that case, however, the Court's premise was that any pretrial detention inherently involved some discomfort; a detainee's sleeping conditions even when not double-bunked were far from ideal, and the additional discomfort of having to share the already close corners with another detainee was not sufficiently great to constitute punishment.

In the case at hand, however, the additional impact on pretrial detainees of webcam transmission is greater by several orders of magnitude than the intrusion inherent in incarceration. Being detained in a county jail necessarily involves being observed by the staff of the jail and the other detainees. The webcams increase exponentially the number of people ob-

serving detainees, and also alter drastically the classes of people who can watch the detainees. The discomfort to a detainee of having her children, for example, watch her while she is being detained is incalculably greater than having jail guards watch the same procedure.

Having determined that Sheriff Arpaio's practice of streaming images of detainees on the web constitutes a harm, we now turn to whether this harm is imposed "for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Bell*, 441 U.S. at 538, 99 S.Ct. 1861. The webcams did not improve the security of the pretrial detention center when closed-circuit video cameras were already present. Indeed, because the webcams were placed so close to the closed-circuit cameras, they did not even serve to increase the area of the jail that was subject to video surveillance. And because the Sheriff's deputies were presumably already monitoring the images captured by the closed-circuit video cameras, there was no added benefit to publishing the images on the internet. An unruly detainee, willing to ignore the watchful eye of nearby prison guards, would not be deterred from engaging in disruptive behavior by the prospect of an unknown private citizen halfway around the world viewing his grainy image over the internet.

Nor do we find any merit to the two alternative purposes put forth by Sheriff Arpaio. First, he contends that the webcams deter crime because the public, having viewed the process of fingerprinting, pat-down searches, and pretrial detention will decide that being arrested and confined in a pretrial detention center is a fate to be avoided. The Supreme Court, however, stated in *Bell* that "[r]etribution and deterrence are not legitimate nonpunitive governmental objectives" that can justify

adverse conditions of detention for pretrial detainees, 441 U.S. at 539 n. 20, 99 S.Ct. 1861, and has classified deterrence as one of "the traditional aims of punishment." *Id.* at 538, 99 S.Ct. 1861 (quoting *Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 168–69, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963)). We also have recognized that deterrence does not qualify as a nonpunitive goal with regard to pretrial detainees. *White v. Roper*, 901 F.2d 1501, 1504–05 (9th Cir. 1990). To be sure, as a general matter, deterrence of crime through a variety of means is a legitimate governmental objective.[4] But, as the Supreme Court and this court have recognized, where an individual is incarcerated before trial but has not been convicted of any crime, imposing adverse conditions during his detention as a means of deterring crimes is not permissible. Such exploitation of pretrial detainees is not "appropriate to assure the de-

tainees' presence at trial [or] to maintain the security and order of the detention facility and otherwise manage the detention facility." *Halvorsen v. Baird*, 146 F.3d 680, 689 (9th Cir.1998). Thus, Sheriff Arpaio cannot point to deterrence, general or specific, as a legitimate government interest that justifies the installation of webcams in the Madison Street Jail.

Second, Sheriff Arpaio argues that the cameras are justified by the County's interest in having its pretrial detention centers open to public scrutiny. We have given prison officials wide latitude in administering pretrial detention facilities, in guaranteeing detainees' attendance at trial, and in promoting prison safety. *Id.* But we fail to see how turning pretrial detainees into the unwilling objects of the latest reality show serves any of these legitimate goals.[5] As the Supreme Court

---

4. We disagree with the dissent's claim that installing webcams in pretrial detention facilities serves the same government interest as a perp walk: deterring members of the public from committing similar offenses.

A perp walk "is a widespread police practice in New York City in which the suspected perpetrator of a crime, after being arrested, is 'walked' in front of the press so that he can be photographed or filmed." *Lauro v. Charles*, 219 F.3d 202, 203 (2d Cir.2000). Our sister circuit held that legitimate perp walks (*i.e.*— ones that are not staged purely for the television cameras) do not violate the Fourth Amendment because they serve the government's interest in informing the public about its efforts to enforce the law that the defendant was charged with violating. *Caldarola v. County of Westchester*, 343 F.3d 570, 576 (2d Cir.2003). No similar interest is served by placing webcams in holding cells because viewers have no idea why the arrestee was booked. As the Crime.com website explained to viewers, arrestees could have been arrested for crimes ranging from disorderly behavior to spousal abuse, from drug possession to murder.

The Sheriff's policy, while less effective than a perp walk, is also far more intrusive,

for it is not just a one-time filming of an arrestee in a public place, but a 24–hour–a–day entertainment program viewable by internet users around the world. The Sheriff does not have "free reign to use videotape or other potentially overly intrusive means to achieve the government purposes enumerated above." *Id.* at 577.

5. We find the dissent's assertion that shaming has "nowhere been cited as a form of penological punishment" both remarkable and deeply troubling. As the Supreme Court said in describing colonial forms of punishment, "[e]ven *punishments* that lacked the corporal component, *such as public shaming, humiliation,* and banishment involved more than the dissemination of information." *Smith v. Doe I*, 538 U.S. 84, 98, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003) (emphasis added); *see also* Dan M. Kahan, *What Do Alternative Sanctions Mean?*, 63 U. Chi. L.Rev. 591, 631–32 (1996). Placing arrestees on public display in the stocks is a part of our distant past and shocks the modern conscience. But under the dissent's approach of treating shaming as a legitimate government objective in the administration of pretrial detention centers, it is difficult to see how such a draconian policy would be impermissible. Although a

has recognized, "[i]nmates ... are not like animals in a zoo to be filmed and photographed at will by the public or by media reporters, however 'educational' the process may be for others." *Houchins v. KQED, Inc.*, 438 U.S. 1, 5 n. 2, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978) (plurality opinion).[6] Also, the Supreme Court has held that the government's otherwise legitimate interest in "informing the general public about the administration of criminal justice" does not justify the presence of reporters during the execution of search warrants at a suspect's home. *Wilson v. Layne*, 526 U.S. 603, 612, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). Such press exposure impairs citizens' Fourth Amendment right to be free of unreasonable intrusions into their homes, held the Court, even when a search is warranted. *Id.* Here, similarly, the otherwise valid governmental interest in assuring accountability and public scrutiny cannot justify broad public exposure of pretrial detainees' intimate circumstances, as none of the purposes justifying pretrial detention are served thereby. The Sheriff's policy is all the more troubling because displaying images of the County's pretrial detainees to internet users from around the world is not rationally connected to goals associated with educating the citizenry of Maricopa County.

We also reject Sheriff Arpaio's contention that the injunction violates his First Amendment rights. The webcam transmissions were not Sheriff Arpaio's *personal* communications. The webcams were governmental property, installed on government-owned premises operated for a governmental purpose; the transmissions were originally over the Sheriff department's official website. Absent his official position, Sheriff Arpaio could not have obtained or transmitted the images. The speech was therefore that of a governmental executive officer acting in his official, managerial capacity, and as such is governmental speech, not the personal speech of a government employee. *Compare Rankin v. McPherson*, 483 U.S. 378, 383, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987) (holding the discharge of a public employee for her comment to a co-worker on a matter of public concern to be a violation of employee's First Amendment rights); *Givhan v. Western Line Consol. Sch. Dist.*, 439 U.S. 410, 415–16, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979) ("Neither the [First] Amendment itself nor our decisions indicate that [freedom of speech] is lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public."). The district court correctly held that "the Bill of Rights protect the individual from the government, not the other way around."

Sheriff Arpaio cites *Downs v. Los Angeles Unified Sch. Dist.*, 228 F.3d 1003, 1013

---

regulation that has the incidental effect of shaming may not be a form of punishment, *see Smith*, 538 U.S. at 98–99, 123 S.Ct. 1140, we have no doubt that when the government acts with the purpose of shaming an unconvicted detainee, it most definitely is committing an act of punishment in violation of the Fourteenth Amendment's Due Process Clause.

**6.** We recognize that, in a case decided before *Bell*, the Supreme Court has held that the disclosure of an arrest record does not violate a constitutionally protected right of privacy. *Paul v. Davis*, 424 U.S. 693, 713, 96 S.Ct.

1155, 47 L.Ed.2d 405 (1976). Here, however, the district court order was not premised on a privacy right, but on a pretrial detainee's Fourteenth Amendment Substantive Due Process right to be free from punishment. In *Paul*, the release of arrest records was not a condition of pretrial detention. More importantly, there is a stark difference between releasing an arrest record and thereby publicizing only "the fact of [a detainee's] arrest," *id.* at 713, 96 S.Ct. 1155, and streaming live images of a pretrial detainee's every movement across the broad spectrum of the internet.

(9th Cir.2000), for the notion that the government has First Amendment rights. But *Downs* simply held that when the government is the speaker, it does not violate the First Amendment rights of individuals by expressing a particular viewpoint. *Id.* Nowhere did *Downs* suggest that the government has a cognizable First Amendment right or interest.

In short, the webcams are not reasonably related to a non punitive purpose. Therefore, we agree with the district court's determination that plaintiffs will likely prevail on their claim that placing webcams in a pretrial detention center violates the Fourteenth Amendment substantive due process rights of pretrial detainees by subjecting them to punishment. Accordingly, we hold that the district court did not abuse its discretion in granting the preliminary injunction.

### IV.

Sheriff Arpaio has failed to demonstrate that the district court abused its discretion in granting the plaintiffs' motion for a preliminary injunction. Accordingly, we affirm the district court's order.

AFFIRMED.

BEA, Circuit Judge, dissenting.

Perhaps in an effort to express their repugnance for the Madison Street Jail webcast policy, the majority opinion substitutes conjecture for analysis of the mootness issue. On the issue whether the webcasts constitute constitutionally impermissible pre-conviction punishment, the majority opinion substitutes the personal tastes of the Court of Appeals judges for the analysis the Supreme Court directs us to use as to what constitutes such punishment. Last, the majority opinion simply refuses to consider any rational relation between the webcasts and the legally permissible governmental purposes stated by the Sheriff. The result is the imposition of the majority's will in the place of the judgment of the lawfully elected representative of Maricopa County voters. Because of these inadequacies, I respectfully dissent.

### I.

*Mootness*

Notwithstanding the parties' failure to brief the issue, the majority opinion correctly acknowledges our responsibility to address the mootness question: whether this action presents a live case or controversy. Then, somewhat perfunctorily, they conclude that this case falls within the "capable-of-repetition-yet-evading-review" exception to mootness. *See Spencer v. Kemna*, 523 U.S. 1, 17–18, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998). To state a cognizable injury under Article III of the Constitution, the Plaintiffs must show a sufficient likelihood that they—*not others*—will be subjected to the webcasts in the future, that is, that they will in all likelihood be arrested and detained at the Madison Street Jail in the future. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (district court granted preliminary injunction to stop use of police chokeholds; Court of Appeals affirmed; Supreme Court reversed, finding Plaintiffs lacked standing to seek injunctive relief absent a showing of realistic threat to Plaintiffs—not others—of future injury).

The majority opinion determines that because some of the Plaintiffs have experienced detention by Appellant Sheriff on earlier occasions, this constitutes "compelling evidence that the Plaintiffs likely will be reincarcerated." I do not take such a dim view of either the ineffectiveness of our criminal justice system or of human

nature.[1] Nor do I believe that any self-ascribed propensity of Plaintiffs towards future arrest and detention—whether through their own malfeasance or simple bad luck—is legally sufficient to clothe Plaintiffs with the required standing.

The majority opinion correctly cites *Spencer v. Kemna* for the applicable standards to the standing requirement, but then proceed to ignore that case's holding that *risk* of future apprehension and conviction is insufficient to establish a personal stake in a habeas challenge to parole revocation procedures:

> [Standing] was contingent upon respondents' violating the law, getting caught, and being convicted. "Respondents themselves are able—and indeed required by law—to prevent such a possibility from occurring." ... "[W]e are ... unable to conclude that the case-or-controversy requirement is satisfied by general assertions or inferences that in the course of their activities respondents will be prosecuted for violating valid criminal laws. We assume that respondents will conduct their activities within the law and so avoid prosecution and conviction."

*Spencer v. Kemna,* 523 U.S. 1, 15, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998) (citations omitted); *see also O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974) (district court dismissed class action challenging bond, sentencing, and jury fee practices in criminal cases; Court of Appeals reversed; Supreme Court reversed, finding that Plaintiffs lacked standing because they had not alleged that they had been or would be improperly charged with violating the criminal law). Because Plaintiffs here cannot show that, but for their future arrest and incarceration, they again would be subjected to being viewed on the Sheriff's webcasts, they have not shown a legally cognizable case or controversy. Only by speculating, without proof, that at some unspecified time in the future they (not others) will again be arrested and taken to the Madison Street Jail, and again be viewed on the Sheriff's webcasts, can Plaintiffs state a cognizable case or controversy. Such speculation is not enough to confer standing on Plaintiffs under the Supreme Court cases cited above.[2]

A finding of lack of standing would seem mandated by a case cited by the majority, *Mitchell v. Dupnik,* 75 F.3d 517 (9th Cir. 1996). Once Mitchell was removed from the detention center and his petitions for post-conviction relief were denied, Mitchell lost standing to seek injunctive relief from detention center practices because there was no reasonable expectation that he would be returned to the detention center. *Mitchell,* 75 F.3d at 528. The majority opinion maintains the plaintiffs here have standing because, in view of their prior arrest records, they are likely to be rearrested. Mitchell arguably had a greater

1. After all, we go to great lengths to *prevent* proof of prior bad acts as evidence of criminal character likely to produce the commission of a new offense. *See* Fed.R.Evid. 404(b).

2. But, some will complain, if these Plaintiffs cannot bring the action, the legality of the Sheriff's webcasts may never be adjudicated. Just so. Such a complaint is based on the unarticulated premise that every government action must be validated or rejected by a court. Nothing could be more in contrast to the constitutional requirements of standing.

Only "cases or controversies" which involve recognized legal rights can be the subject of a federal court action. "We can decide only cases or controversies. A moot case is not a 'case' within the meaning of Article III." *Eisler v. United States,* 338 U.S. 189, 194, 69 S.Ct. 1453, 93 L.Ed. 1897 (1949). As to other claimed issues, remedies may have to be sought at the ballot box, the market place or by other means provided by society, but not lawsuits.

claim that he was likely to be detained in the future—he was a convict, not just a detainee. Yet Mitchell did not have standing. *Id.*

I would reverse the district court's order granting a preliminary injunction on the ground that Plaintiffs have not presented a justiciable case or controversy in this action.

## II.

### Claimed "Punishment"

The majority's conclusion that the webcasts inflict punishment prohibited by the Constitution is likewise unconvincing. As public servants, county sheriffs are charged with several important duties under Arizona law. These duties include preserving the peace, "arrest[ing] and tak[ing] before the nearest magistrate for examination all persons who attempt to commit or who have committed a public offense," "prevent[ing] and suppress[ing] all affrays, breaches of the peace, riots and insurrections ...", and "[taking] charge of and keep[ing] the county jail ... and the prisoners therein." ARIZ. REV. STAT. § 11–441(A).[3]

Given the importance and difficulty of fulfilling the responsibility of operating penological installations, courts have taken an understandably cautious approach to second-guessing the decisions of prison administrators:

> [T]he problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches

of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint. Where a state penal system is involved, federal courts have ... additional reason to accord deference to the appropriate prison authorities.

*Turner v. Safley,* 482 U.S. 78, 84–85, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) (in class action challenge to prison regulations regarding correspondence and inmate marriage, district court granted preliminary injunction in favor of inmates; Eighth Circuit affirmed, finding regulations violated First Amendment; Supreme Court reversed ruling on correspondence regulation, but affirmed order enjoining inmate marriage prohibition). This rationale is no less applicable in the context of jails and detention facilities. *See Mauro v. Arpaio,* 188 F.3d 1054 (9th Cir.1999) (district court granted summary judgment in favor of county on challenge by prisoners and detainees to jail's rule against sexually explicit periodicals; Court of Appeals affirmed, finding regulation reasonably related to legitimate penological interests).

The district court's injunction was predicated on the belief that webcam broadcasts constitute impermissible pre-conviction "punishment" in violation of Fourteenth Amendment substantive due process. Although, "under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt," *Bell v. Wolfish,* 441 U.S. 520, 535, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), "if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more,

---

**3.** Sheriff Joe Arpaio was elected by the people of Maricopa County in 1992, and reelected in 1996 and 2000.

amount to 'punishment,'" *id.* at 539, 99 S.Ct. 1861; *see also Valdez v. Rosenbaum,* 302 F.3d 1039, 1045 (9th Cir.2002) (district court granted summary judgment in favor of jail officials in detainee's challenge to restrictions on telephone access; Court of Appeals affirmed). The relevant inquiry is whether jail policies are reasonably related to legitimate penological interests, as opposed to "an inflexible strict scrutiny analysis [that] would seriously hamper [the Sheriff's] ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration." *Mauro,* 188 F.3d at 1058.

The majority opinion gives needlessly short shrift to the governmental objectives proffered by Sheriff Arpaio. Although the majority opinion briefly acknowledges that the Sheriff's legitimate governmental purpose in the webcasts is to deter the non-jailed public from conduct which might obligate them to visit the jail other than by virtual means, the majority opinion leaves unexamined whether the webcasts are rationally related to the achievement of this goal. The majority opinion jumps to the question of whether the webcasts deter the already-jailed, but does not say a word about whether the webcasts were intended to deter the general public from illegal conduct.

Let us then apply the rational relation test to each of the Sheriff's proposed purposes:

Is it rational to believe that broadcasting pictures of detention installations will deter viewers from conduct that may land them there? Any traffic school attendee who is required to view ghastly photographs of crashes that result from speeding can attest that the consequences of actions are displayed to deter certain behavior. The rational relationship between prison views and deterrence of criminal behavior is similarly clear.

Do webcasts provide transparency to governmental operation of the facility? Clearly so. Of course, there are other means by which to provide such transparency. The Sheriff could give civic-minded groups tours of the jail to assure them of proper conditions and well-spent taxes. But whether the choice to expose detainees by webcast to millions or by tours to dozens is surely a matter of degree, left to the discretion of an elected official, restrained only by notions of whether choice of the larger number of viewers makes the measure "excessive" under *Bell.*

Do webcasts deter the filing of frivolous lawsuits against the county and county officials? Given that security cameras are already in place to videotape what actually happens in the jail, this purpose may suffer from the same redundancy as does the jail security rationale. On the other hand, the webcasts may reach more potentially frivolous litigants than would the knowledge that the jails had security cameras in place.

It bears repeating that this is a case where we may review governmental action only to determine whether that action bears a rational basis to legitimate governmental interests. *See Mauro v. Arpaio,* 188 F.3d 1054, 1060 (9th Cir.1999) (en banc). This is not a case where the Sheriff's actions are subject to a "strict scrutiny" test.

By the proper "rational relation" test, the webcasts seem clearly allowable to attain public deterrence and transparency purposes. *Bell* stands for the proposition that if there is *a* "reasonable relation" between the measure and a legitimate governmental purpose, the measure will not be found to be punishment, "without more." *Bell,* 441 U.S. at 539, 99 S.Ct. 1861. What is this "more" that may nonetheless invalidate a measure, even after a finding it is "reasonably related" to a legit-

imate governmental purpose? *Bell* gives us a non-exhaustive list of factors, which includes:

> Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of *scienter*, whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned are all relevant to the inquiry, and may often point in differing directions.

*Bell,* 441 U.S. at 537–38, 99 S.Ct. 1861(citing *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963)). The *Bell* Court noted that the objective of deterrence of the person punished is only one of a series of "useful guideposts" in determining whether a restriction or condition is "punishment," while acknowledging the possible existence of a constitutionally-valid "alternative purpose," later recognized in *Turner*.[4] *Bell,* 441 U.S. at 538, 99 S.Ct. 1861. Reviewing these guideposts in the context of this case, the conclusion that the webcasts purport to visit constitutionally-prohibited punishment on detainees is untenable.

Let us examine each of the *Bell* factors. An affirmative answer indicates a factor in favor of finding the measure to be prohibited punishment; a negative answer, indicates the measure is not punishment: a factor favoring permitting the measure.

1. Do the webcasts involve an affirmative disability or restraint? No. Inmates are not restricted to zones perused by the webcams. Neither are they detained in jail a moment longer because of the webcasts.

2. Are the webcasts historically regarded as punishment? No. They are too new to have a historical characterization.

3. Are the webcasts activated only on a finding of *scienter?* No. The inmates are detained or arrested on misdemeanors, such as minor traffic offenses and drunkenness, which do not require *scienter*.

4. Do the webcasts promote the traditional aims of punishment—retribution and deterrence? Yes, to the extent that emotional discomfort—shame—is visited on the *detainees,* that can be retribution and deterrence of the detainees. Indeed, the Sheriff admits he hopes the experience will deter recidivism. But No as to deterrence of the viewing public. There can be no punishment of the viewing public because that public is not shown on the webcasts, and because if offended the public viewer need only single-click to close the screen. Thus, the retribution and deterrence factor presents a mixed response.[5]

5. Is the behavior to which it applies already a crime? No. The behavior viewed by the webcams is pretrial detention that, by itself, is not a crime.

---

**4.** There is nothing in *Turner* which limits this principle solely to convicted prisoners, as the majority opinion claims. While it is accurate to say that *Turner* involved those already convicted of crimes, they, like Plaintiffs, retained certain constitutional rights such as not to have additional punishment visited on them without a predicate finding of guilt for different and additional transgressions. Were there a valid "alternative purpose" to the challenged measure, convicts as well as detainees would fail in their constitutional challenge.

**5.** This constitutes a fulfillment of *Bell's* prediction that inquiry into what factors make up punishment "may often point in differing directions." *Bell,* 441 U.S. at 538, 99 S.Ct. 1861.

6. Does it appear excessive in relation to the alternative purpose of public deterrence? No, when compared to the constitutionally permissible publicity routinely given to "perp walks" on local and nationally broadcast television.

The balance of *Bell* factors weighs heavily—almost exclusively—against the existence of the additional characteristics required by *Bell* to disqualify a measure reasonably related to the achievement of a legitimate governmental objective as punishment. Nonetheless, the majority opinion accepts a contrary assessment wholesale, seemingly as an article of faith. It is particularly telling that in the portion of the majority opinion concluding the webcasts constitute punishment, the majority cite no authority, case or statute, for the proposition that webcasts are punishment. That majority opinion's aversion to the webcasts is not shared by the voters of Maricopa County, who re-elected Appellant Arpaio shortly after the webcasts commenced.

The majority opinion omits the *Bell* analysis [6] and equates webcasts with harm without establishing that such harm rises to the level of constitutionally-prohibited punishment. The webcasts publicize the arrest and, to that extent, may result in shame being inflicted on detainees. While shaming has long been a method of societal ostracism, it has nowhere been cited as a form of penological punishment, much less is there any authority for the claim that shaming causes violations of individual rights protected by the U.S. Constitution.[7]

The majority opinion attempts to dispose of the Supreme Court's holding in *Paul v. Davis* in a footnote. *Paul,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), is more pertinent than the majority opinion would allow. That case concerned the stigmatizing of persons arrested for, but not convicted of, shoplifting, by police officers distributing a flyer that listed the Plaintiffs among active shoplifters. The Supreme Court declined to attach much significance to the claims of dignitary injury which are directly analogous to the claims asserted by the Plaintiffs here. The Court held that the government does not, simply by the act of defaming a person, deprive him of liberty or property

---

**6.** Nowhere does the majority opinion ask the six questions above as to the six *Bell* factors regarding whether a measure taken constitutes punishment.

**7.** The majority opinion quotes disapproving references by the Supreme Court to colonial shaming punishments, *see Smith v. Doe,* 538 U.S. 84, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2002), and mischaracterizes this dissent as "treating shaming as a legitimate government objective." The majority opinion conveniently omits additional reasoning contained in the same opinion:

> [P]ublic shaming, humiliation, and banishment, involved more than the dissemination of information. They either held the person up before his fellow citizens for face-to-face shaming or expelled him from the community.... Our system does not treat dissemination of truthful information in furtherance of a legitimate governmental objective

as punishment. On the contrary, our criminal law tradition insists on public indictment, public trial, and public imposition of sentence. *Transparency is essential to maintaining public respect for the criminal justice system, ensuring its integrity, and protecting the rights of the accused. The publicity may cause adverse consequences for the convicted defendant, running from mild personal embarrassment to social ostracism.* In contrast to the colonial shaming punishments, however, the State does not make the publicity and the resulting stigma an integral part of the objective of the regulatory scheme.

*Smith v. Doe,* 538 U.S. at 97, 123 S.Ct. 1140 (emphasis added). Thus, this case appears to suggest that while shaming *qua* shaming is impermissible, regulations or conditions not characterized by face-to-face confrontation or banishment are not *per se* penological punishment.

rights protected by notions of procedural due process, absent some adverse impact on some other legally cognizable interest. *Id.* at 708–10, 96 S.Ct. 1155. Note that in *Paul,* Plaintiffs claimed dignitary injury because they were defamed, falsely portrayed as shoplifters by the police flyers. Here, Appellees can hardly claim the webcasts defame them. The more clearly they appear on camera, so does the truth: they have been detained for alleged lawbreaking.

The so-called dignitary harms asserted by the Plaintiffs in this case are also similar to the Fourth Amendment[8] objections of arrestees subjected to the now ubiquitous-on-TV "perp walk"—the conspicuous exhibition of coiffed, suited, corporate criminal suspects, usually handcuffed, as they are brought to the courthouse or police station before charging, much less conviction. Although a staged "perp walk" has been termed an unreasonable seizure where it does not advance legitimate law enforcement purposes, it is not the case "that all, or even most, perp walks are violations of the Fourth Amendment." *Lauro v. Charles,* 219 F.3d 202, 213(2d Cir.2000) (reversed in part district court's partial summary judgment which found staged perp walk had violated Fourth Amendment rights of Plaintiff and denying qualified immunity to defendants; appellate court found Fourth Amendment violation, but also found defendant police officers were entitled to qualified immunity).

Perp walks and their attendant shaming do not constitute constitutionally impermissible pre-conviction punishment for the same reasons webcasts do not. Whatever the consequence of an arrestee's being "displayed to the world, against his will, in handcuffs, and in a posture connoting guilt," *Id.* at 212 n. 7, perp walks promote many of the same governmental purposes put forward here by Sheriff Arpaio.

> Yet, perp walks also serve the more serious purpose of educating the public about law enforcement efforts. The image of the accused being led away to contend with the justice system powerfully communicates government efforts to thwart the criminal element, and *it may deter others from attempting similar crimes.*

> \* \* \*

> Divulging the arrests *also enhances the transparency of the criminal justice system, and it may deter others from attempting similar crimes.* Furthermore, allowing the public to view images of an arrestee informs and enables members of the public who may come forward with additional information relevant to the law enforcement investigation . . .

*Caldarola v. County of Westchester,* 343 F.3d 570, 572–73 & 576 n. 3 (2d Cir.2003) (citations and quotations omitted, emphasis added) (affirming district court's summary judgment in favor of defendants, holding arrestee's privacy interests outweighed by legitimate governmental objectives of perp walk); *see also Rosenberg v. Martin,* 478 F.2d 520, 525–26 (2d Cir.1973) (reversing jury award of damages in 42 U.S.C. § 1983 claim, finding no violation of right to priva-

---

8. The district court properly rejected Appellees' claims of violations of privacy rights for the best of reasons: The Supreme Court has held that prisoners in custody do not have a reasonable expectation of privacy in their cells arising from the Fourth Amendment. *See Hudson v. Palmer,* 468 U.S. 517, 526, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) (district court granted summary judgment in favor of prison guard on inmates claims of violation of privacy, destruction of personal property and denial of due process; Fourth Circuit reversed in part on privacy claims; Supreme Court reversed, finding inmates had no reasonable expectation of privacy).

cy where defendant was taken out of the police car a half block away from the station and paraded before television cameras, while the arresting officer announced "He is the killer, and he is going to burn.").[9]

Likewise, sex offender registration laws which involve the "dissemination of accurate information about a criminal record, most of which is already public," have survived Ex Post Facto challenges because, although such registration laws may shame, their application does not effect penal punishment. *Smith v. Doe*, 538 U.S. 84, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2002) (rejecting ex post facto challenge to Alaska sex offender registration statute). The argument that any governmental program which has the goal of public deterrence must visit impermissible punishment is not persuasive.

> [It] proves too much. Any number of governmental programs might deter crime without imposing punishment. To hold that the mere presence of a deter-

rent purpose renders such sanctions 'criminal' . . . would severely undermine the Government's ability to engage in effective regulation.

*Smith v. Doe*, 538 U.S. at 102, 123 S.Ct. 1140; *see also Hatton v. Bonner*, 346 F.3d 938, 948 (9th Cir.2003) (applying *Smith* to California sex offender registration statute).

Where the sole effect of a measure is deterrence of the preconviction detainee, the measure may violate the fourth factor listed in *Bell*.[10] Here, as in the perp walk, the webcast's effect is purposely beyond deterrence of the detainees; its purposeful effect is also to deter unlawful conduct by members of the public who have as yet not been—and one hopes never will be—detained.[11]

Persons arrested cannot choose to whom the fact of their arrest can be publicized, whether it is through a perp walk shown on nationwide television, or an arraignment calendar detailing the charged crimes, hanging outside a courtroom.[12]

---

**9.** The majority opinion attempts to distinguish "perp walk" cases which have passed constitutional muster partially on the grounds that the interest involved in those cases derived from the Fourth Amendment, rather than from the Fourteenth Amendment as claimed here. These cases do not deter the majority opinion from citing Fourth Amendment jurisprudence (*see Wilson v. Layne*, 526 U.S. 603, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)) to argue the webcasts were "excessive." Rather than such selective applications, I would suggest that notions of what is permissible under the Fourth Amendment should inform what is permissible under the Fourteenth Amendment across the board.

**10.** A point on which I agree with the majority, perhaps I did not make it clearly enough. The point is that although shaming may cause the pretrial detainee emotional harm, which would be impermissible if the only purpose were to deter his future criminal conduct. But, where there is another, legitimate governmental purpose served by the incidental imposition of such emotional harm, shaming

does not become "punishment" under *Bell*, *supra*, unless it is "excessive" under the six-factor test advanced in *Bell*, an examination left undone by the majority.

**11.** The majority opinion finds that the sole legitimate purposes of pretrial detainment measures must be limited to those which are appropriate to assure the detainee shows up for trial and to maintain jailhouse security, citing *Halvorsen v. Baird*, 146 F.3d 680 (9th Cir.1998). Such a finding is directly contradictory to the "perp walk" cases which allow for pre-trial detainment measures if rationally related to (1) general deterrence of crime and (2) governmental operations transparency.

**12.** The majority opinion cites *Houchins v. KQED*, 438 U.S. 1, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978), for the proposition that detainees cannot be made part of a "reality show" for purposes of educating the public. *Houchins* dealt with the right, if any, of *a television station* to film detainees. Regardless of the self-ascribed high educational calling of pub-

"Exposure of the self to others in varying degrees is a concomitant of life in a civilized community. The risk of this exposure is an essential incident of life in a society which places a primary value on freedom of speech and of press." *Time, Inc. v. Hill,* 385 U.S. 374, 388, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967).

Sheriff Arpaio articulated a number of purposes justifying the webcasts, only one of which—jail security—was addressed by the district court in its preliminary injunction order. Clearly, "maintaining institutional security and preserving internal order and discipline are essential goals" in the operation of a detention facility. *Bell,* 441 U.S. at 546, 99 S.Ct. 1861. However, the district court rejected the Sheriff's contention that webcams contribute to jail security, finding this task was accomplished by closed-circuit security cameras. The redundant placement of the webcams next to the security monitors indicates the webcams were an excessive response [13] to this otherwise legitimate objective. *See Valdez,* 302 F.3d at 1046. The district court did not abuse its discretion in such finding of unnecessary redundancy.

But nowhere in the district court's order is there a discussion of the Sheriff's *other* justifications [14] for the webcasts: (1) deterrence of crime outside the jail; and (2) transparency of jail operations for civic purposes. The majority opinion attempts to take up this slack by addressing the first of these remaining justifications, but the attempt misses the Sheriff's points.

The district court concluded that "deterrence" of the *Maricopa detainees* from committing future crimes was impermissible pre-conviction punishment *of the Maricopa detainees.* Likewise, the majority opinion cites *Bell* by a disembodied quotation: "[R]etribution and deterrence are not legitimate nonpunitive governmental objectives." *Bell,* 441 U.S. at 539, n. 20, 99 S.Ct. 1861. However, a complete reading of the *Bell* decision indicates that the Court there was talking about deterring *detainees'*—rather than the public's—future commission of crimes. Deterrence of the unarrested *public* from committing acts which would result in arrests is a different governmental purpose and presents a different issue entirely. *See Smith v. Doe,* 538 U.S. at 102, 123 S.Ct. 1140 ("Any number of governmental programs might deter crimes without imposing punishment.").

What the majority opinion avoids—perhaps because of the all-too-predictable result—is to ask the question basic to any review questioning the validity of governmental action under a rational basis analysis: were the webcasts reasonably related to the purpose of deterring public behavior that could result in pre-trial detention? The answer clearly is Yes.

As noted above, in addition to operating the Madison Street Jail, Sheriff Arpaio has been charged with the prevention of crime.

lic television, such stations are not charged by public statutes with the duty to deter crime or to administer jails as is Sheriff Arpaio. *Houchins* simply did not involve any of the issues framed in this litigation. Similarly, *Wilson v. Layne,* 526 U.S. 603, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999), involved the claimed right of the Press to accompany police in the execution of search warrants. The issue there was a vindication of Fourth Amendment rights in the homes of the subjects of the search warrants against persons not members

of law enforcement. The case is not apposite here because the Plaintiffs are not being seen in their homes; they are in jail, where their search and seizure rights are greatly circumscribed (*see Hudson v. Palmer* ).

**13.** This is the proper test under *Bell v. Wolfish.*

**14.** Alternative purpose[s] to which [the measure] may rationally be connected." *Bell,* 441 U.S. at 538, 99 S.Ct. 1861.

I do not agree that an overly broad reading of *Bell* should be applied to undermine a perhaps effective method for achieving such a laudable goal as deterring crime among the public at large. Similarly unexamined is the Sheriff's purpose of providing transparency of jail operations as a civic good. *See Caldarola*, 343 F.3d at 572–73.

Sheriff Arpaio's methods to achieve his purposes of public deterrence and governmental transparency may not suit the fine sensibilities of some group advocates and jurists. But absent a violation of the constitutional rights of Plaintiffs—and I see none—such differences of opinion must be vindicated, if at all, in the ballot box, not in the courtroom.

A district court abuses its discretion when it fails to consider appropriate factors in fashioning an equitable remedy. *See Sony Computer Entertainment, Inc. v. Connectix Corp.*, 203 F.3d 596, 602–07 (9th Cir.2000). The injunction was improvidently issued in this case because the district court's order (1) is not supported by adequate consideration of the Sheriff's stated legitimate, governmental objectives, and (2) is based on the legally erroneous conclusion that all levels of possible shame constitute constitutionally prohibited "punishment," without any consideration of the factors discussed in *Bell*.

Accordingly, I respectfully dissent, and would reverse the judgment of the district court granting the preliminary injunction.

